May it please the Court, Samir Deghasan, Pro Bono Counsel for Appellant Mr. David Scott Harrison, I'd like to reserve three minutes of time for rebuttal. All right, you need to watch your mouth. Sure. Thanks, Jono. The Government concedes that the District Court in this case applied the wrong standard of review and that its reasoning was seriously flawed and legally indefensible. The Government nonetheless asks this Court to affirm summary judgment based on its own application of intermediate scrutiny in the first instance. But intermediate scrutiny is a standard the Supreme Court has rightly called demanding. Under that standard, the Government has the affirmative burden of showing, through record evidence, that the challenged policy was, as the Supreme Court has called it, determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the differences between men and women. That's the test that they have to fulfill. And the Government's burden here is all the more demanding because of the summary judgment posture. The Government has to show that every reasonable fact-finder would conclude, based on this record, that the Government has met that demanding burden. There is no way that the record in this case, which consists entirely of a single declaration and two pages of highly general statistics, could come close to meeting that standard. In this record, there are huge categories of property items where there is just simply no evidence whatsoever. So things like hygiene products, gambling, stealing, sugary beverages, things like that. There is literally no evidence in that record regarding those items. And even with respect to the items that there is some evidence, it is far less than in the cases the Supreme Court has held that the evidence is insufficient. And that's, you know, in cases like Craig v. Boren, where the propensity evidence was far more significant than the evidence that you have here. Things get even worse for the Government if you turn away from this record and you look to the administrative record. Because, again, the inquiry is whether there was a reasoned analysis here or whether or not this was based on reflexive stereotyping. And there are plenty of statements in the administrative record that the Government introduced in this case that show that there was no reasoned analysis and that there was reflexive stereotyping. So, for example, in 2007, 2008. What deference do we give to the Department of Corrections in dealing with an inmate in administrative segregation in one of the, I guess, is the highest security level prison in the California system? As I understand it, Pelican Bay is the equivalent of the Supermax facility in the federal system in Florence, Colorado. Is that correct? Well, this case involves San Quentin Prison, but where I think there is a huge range of different sorts of prisons, including relatively low security prisons. Okay, well, my question actually does deal with the differences in security classifications because these regulations apply to everybody at San Quentin from the lower level general population inmates to those who are on death row. Is that right? There's a lot of different, quite complicated matrices that are used, but there are several distinctions made between male prisoners at San Quentin. So there's administrative segregation that involves very significant restrictions on property. Then there's a level four security classification. Then there's the level three to one general security classification. All four of those classifications are people in the general population, but the department does significantly distinguish between the property that people in security level four can get and those that in security levels one and three can get. And in all of those categories, including the lowest security classification, men are entitled to less property than even the most dangerous woman, i.e., a woman in security classification level four. So that's one of the sort of features of this case is there's no apples to apples comparison between women and men at the same level of security level classification. The government has not even tried to introduce any evidence that makes that comparison. And the government has simply said, well, it's very hard to control the flow of property within a prison. But that assertion is belied by the scheme that's set up, as Your Honor sort of pointed out. There is already a scheme whereby that property items are denied to individuals who are security level classification four and are allowed for individuals who are one to three. So the system is already set up to prevent the flow of property between those sort of low, less dangerous security prisoners and those high dangerous security prisoners. And so there needs to be, you know, some, I think, comparison as to why it is that a woman who has maybe committed a murder has maybe tried to escape herself, has committed a violent crime. It's still considered to be less violent or less of a security risk than a man in the lowest level of security classification where he may have never committed any violent crime whatsoever. And it's just sort of one of the many areas with this. Sorry, Your Honor. I was going to ask, what's the classification of your client? I thought he was a two or a three. He's a two. He's a two, okay. He's a two. His record in prison has been generally exemplary, but his commitment offense was very serious. So that place him at a two. And I think, Your Honor, I think it just sort of shows to some degree just how little there is in the record, that there's no comparison there. As to the individual property items, this record has no information whatsoever, for example, about these hygiene products. There are significant gaps in the number of products that women can have. Men can't have shower caps, shower bags, facial cleansers, cotton balls, fabric softeners, sandals. There's absolutely nothing in the record that explains why that's the case. And the explanation, if you want it, you can look back to the administrative record, and it's very jarring. The explanation the government gives in the administrative record is the department believes that a female inmate who feels good about how she looks is more amenable to rehabilitation. They also said women have a different psychological makeup to male inmates, such that appearance is linked to successful recovery. But there's nothing in the administrative record or in the record before this court that sort of links appearance and recovery. And it's obviously a facially stereotypical view. In fact, the government in 2007, 2008, and 2014, as required by California law, made the statement that it had not identified nor relied upon any theoretical, technical, or empirical study report or similar documents. So there's lots of assertions about the differences between men and women in the administrative record, including these things. They mentioned self-esteem issues five times. They say men are more likely to be predatory.  They say women are more likely to be sexual or physical abuse victims. But they admit that they never collected any data as to any of those things. And so there's just no way for this court to be able to say, based on the record that's before it, that the government has met its burden, its demanding burden on intermediate scrutiny of showing an exceedingly persuasive justification for this policy. What relief are you asking for here? Can you just tell me what relief are you requesting here? Do you want it sent back down and the Bureau of Prisons make all these findings, or the court make it, or what do you want? Right, Your Honor. I think the court has two options. I think the primary option that we set forth in our briefs is that this court should enter summary judgment in my client's favor because the government moved the summary judgment. My client moved the summary judgment. The record is closed, and the government bears the burden. Usually when a party that bears the burden is unable to satisfy that burden, that leads to summary judgment in favor of the other side. And I think in this context, that would mean you would strike down the property schedule. The government would, of course, be able to come back and rewrite a new property schedule. And I think the district court would have discretion, for example, to stay effective in any injunction for a reasonable period of time for the government to go away and come up, you know, actually engage in the kind of reason analysis that the Supreme Court's cases require. I think because of the unusual posture of this case where the government has changed position as to the applicable standard on appeal, it may also be appropriate simply for this court to remand to the district court in the first instance and allow the government to introduce some new evidence in the district court. I think both of those options are very much on the table for the court. Obviously, we would prefer the first, but I do think the second is also reasonable, given the unusual posture of this case. I'm still looking for an answer. I'm sorry, I didn't ask the question very well. I'm still looking for an answer. What do we tell the district court with regard to the case law under Turner v. Safely in evaluating the constitutionality of these regulations, even if we agree with you that there's an equal protection violation here? How does the district court factor in legitimate penological interests when it's applying intermediate scrutiny? I understand, Your Honor. I think we agree with the government on this, which is that legitimate penological interests are a significant factor that need to be taken into account. Just like any compelling government interest, it's something where the government has more expertise, and I think if it's able to provide sufficient evidence, some of that grounded in that expertise, I think then that's something the district court should give appropriate weight to. So we don't disagree with that. What we disagree with is that they've done anything remotely like that in this particular case based on this particular record. It's a balancing test that the court weighs the proffered penological justifications for the differentiation that the state is making in its regulation. I think just like any intermediate scrutiny case, the ultimate question is, did the decision maker engage in the reasoned analysis, or did it reflexively rely on stereotyping? And that requires an assessment of the evidence before the decision maker. It requires an assessment of how that is then borne out in the scheme. Is the scheme itself well tailored? And I think all of those questions can be addressed within the framework of saying we trust that the government has serious penological interests, and that the government is in a much better position to judge what those are than courts are. So we can give kind of wide latitude to the government on that score, but it has to do far more than it's done here. And so I don't think it's any different to – I don't think we're asking for any different test than the court would normally apply. In a normal intermediate scrutiny case, the government is given a lot of deference as to its legitimate interest. If you look at a case like Craig v. Boren, obviously drink driving is an area of traditional state regulation. It's an area where there's significant deference given to the state. But even within that framework, intermediate scrutiny can still be a demanding standard, and the government has to do at least a little bit more than what it did in this case where it introduced hardly any evidence whatsoever. And so I do think, Your Honor – well, I think if the court has enough other questions, I might reserve the rest of my time. Great. Thank you, Your Honor. All right. Counsel for the appellee. Thank you, Your Honor. May it please the court, Josh Patashnik on behalf of the state appellees. The possession of personal property by prison inmates entails considerable security risk. Inmates sometimes try to use property items as weapons to facilitate an escape attempt or for other harmful purposes. For that reason, inmates' possession of property items is strictly limited and is the subject of detailed and extensive regulations. In reviewing those regulations, courts must be mindful of the unique security risks that exist in prisons and of their own limited institutional capacity and expertise in the area. So, Counsel, I want to pick up on something that was talked about with Counsel for the appellant. Below, your position was that a different standard applied, the Turner v. Safley standard, which is a lesser standard than we're talking about or have been talking about so far. And the record that was presented on behalf of your client was presumably aimed at that lower standard. So what is your position with regard to what we do with this case at this point? Your Honor, we think the court can and should affirm the judgment below under intermediate scrutiny. It's true that we argued for a different standard in the district court. But now that the case is on appeal to this court and the court appointed counsel and ordered replacement briefing, the department looked at the issues in the case afresh and concluded that intermediate scrutiny should apply. But we're still defending the department's property regulations, and we're defending them for the same reason we did below, that they are directly related to the department's very important interests in prison security and gender responsiveness. This court's general rule is that if the district court hasn't applied the right standard, that we typically will remand for the district court to do so in the first instance. Why doesn't that make sense here? Your Honor, that's certainly an option that's open to the court if the court thinks that further factual development is required. But in light of the nature of Mr. Harrison's claim, we think the record is sufficient for this court to affirm under intermediate scrutiny. I think it's important to recognize that in his administrative complaint and in the district court, Mr. Harrison has not challenged the department's treatment of individual items of property. His claim is pitched at a higher level. He's challenging the department's decision to have separate property schedules in the first place for male and female inmates, the department's decision-making process in connection with that decision. And at that level, the record sufficiently shows under intermediate scrutiny that the distinctions the department has drawn are substantially related to its important interests in prison security and gender responsiveness. Counsel, if we were to remand, is there additional data available that the department might seek to introduce to support these regulations? There were very few CompStat data sheets in the record. And I'm wondering if there's anything that you would proffer if you're going to back for a hearing. Yes, Your Honor, there certainly is more data that the department could introduce. We think the CompStat data that's in the record is sufficient to show that there are significant differences in the security environment in men's and women's prisons. So, for instance, the data in the record at SCR 121, 122 show that in 2015, there were 18 murders and 253 attempted murders in men's prisons and zero in women's prisons. There were 392 incidents of in-cell violence in men's prisons and zero in women's prisons. There were 1,613 documented uses of a weapon in men's prisons compared to 37 in women's prisons. So it's true, yes, the department could come forward with more data, but we think the data that's in the existing record are sufficient to show that there is a substantial difference in the overall security environment in men's prisons versus women's prisons. Even for the same type of offender, in other words, if I take the most dangerous woman at the highest level of classification and compare her property schedule to the most dangerous man, you would concede that there are significant differences, would you not? Well, the data in the record don't speak to incidents committed by individual prisoners, but I think it's reasonable for the department to craft property regulations not just at the individual prisoner level, but based in part on the overall security environment that exists in men's and women's prisons. No, I don't think you understood my question. Really, it's a question of the difference in treating women offenders differently than the most dangerous male offenders. As I understood your opposing counsel's argument, his argument is that there is no data that justifies that difference, which appears to be based simply on gender. Yeah, a couple of responses to that, Your Honor. First, for both male inmates and female inmates, the most serious inmates, those that present the greatest security risk, are generally housed in admittance segregation or the security housing units. And for both male inmates and female inmates, their property possession is very strictly limited. There's a separate schedule that applies to male inmates in that type of housing, and on the female inmates' schedule, there's a separate, you can see in the record, a separate column that applies to those inmates. Now, is it true that women at that level are permitted more property items than men? As to inmates in ASU and SHU housing? Yes. That may be true, Your Honor. That issue wasn't addressed in the briefing. What I do know is that for both men and women, inmates in that type of housing, their property is very strictly limited. There may be certain gender discrepancies, but that hasn't been a focus of the briefing. Well, for example, do they suffer the same limitations on sweetened products that can be used to make food, versus women? Now, are you talking about the inmates in ASU and SHU housing? Yes. I have to go back and check the record. I believe that those items are restricted from both male and female inmates. There is a distinction as to inmates of Mr. Harrison's classification, for instance, Level 2. Male inmates are prohibited from possessing sugary foods, and female inmates are sometimes allowed those products. The reason for that, as explained in the Bickham Declaration that's in the record, is that in the Department's experience, male inmates have historically sometimes tried to use those items to manufacture pruno, or food like alcohol. And in the Department's experience, that has not been as significant a problem in women's prisons. And that is in the record in this case. Is this from Captain Bickham's statement, or somebody else's? Yes, from the Bickham Declaration. Okay. He say it's from his personal knowledge, or he's quoting some other statistics? Yeah, he is talking about his personal knowledge. He was, at the time of his declaration, he was the department official in charge of formulating the property regulations, so he had expertise in this area. He was talking about his own experience in that capacity. I believe he also referenced CompStat data in connection with pruno. That data is not itself attached to the record, unlike the data for security incidents, but certainly could be compiled if necessary. But I don't think there's any reason to question his sworn testimony based on his experience. Well, the point of claims that Captain Bickham doesn't have any knowledge about this, except just some statements about it, he's not gotten any statistics. It's just his personal feelings about it. Is that correct? No, Your Honor. The Bickham Declaration is based both on the CompStat data and on his experience as the department official at the time in charge of property regulations. The department didn't pick Mr. Bickham at random to be its declarant. It picked him because he was the official with the relevant knowledge and expertise in this area. Well, isn't he the official at headquarters in Sacramento that oversees the promulgation of these regulations? Yes, I believe he was based in Sacramento. But again, he had experience working in prisons and drew upon the collective wisdom and experience the department has amassed in operating prisons throughout the state. In terms of data, the only thing in the record relates to incidents of violence. Is that correct? That's correct, Your Honor. And that's because, for one thing, concerns of prison security are the most important interest underlying the distinctions the department has drawn in this case. I guess ultimately my question is, is every distinction that is drawn based on violence and the risk of violence? And I guess I'm thinking about makeup and Uno cards and some of these things where the risk to violence, the connection to violence isn't intuitive as it might be with other items that could be used to inflict harm. It may not be intuitive, Your Honor, or immediately apparent to a layperson, but that doesn't mean that it doesn't exist. I think the Uno cards are a good example. As Captain Bickham explained, those are on the list because in the department's experience, that card game specifically had led to gambling in men's prisons, which, as you might imagine, in turn leads to violence and other security disruptions. The concern about Bruno, for instance, is also linked to violence. It's not surprising that inmates who consume alcohol might be more violent. The distinctions that are based on certain items of hygiene, those are often because the containers that those items come in contain small metal pieces that may be used as weapons. One way or another, directly or indirectly, the vast, vast majority of items as to which there are gender-based distinctions are linked to the department's concern about the greater level of violence in men's prisons. If I might just address, my friend on the other side made the point that the 2007 regulations have some statements that might be read to partake of outdated gender stereotypes, and I think that's an important point. I would like to address it. In our view, the best way to read those statements is in light of the two decades of expert recommendations that had come before them, in which, starting with the American Correctional Institute's recommendation in the 1980s and continuing through the 2000s, recommended that corrections departments become more responsive to the specific needs and concerns of female inmates, including with respect to the possession of personal property. These experts had noted that property schedules were generally tailored to conditions in men's prisons and not in women's prisons, and it stands to reason that improved morale can result from inmates being able to possess items of property that they want, and that is, in turn, linked to better rehabilitative outcomes. So while I acknowledge that it's possible to read some of those statements as partaking of outdated gender stereotypes, we think the better way to read them is simply as an acknowledgement of the unsurprising point that experts have been making for decades, that female prisoners can have better rehabilitative outcomes if they're allowed to possess certain items of property that do not pose a significant security risk in women's prisons, but may in the different kinds of men's prisons. So what in the record shows us that those conclusions that have been reached by people who look at this are based on some sort of reasoned analysis as opposed to stereotypes? Well, I think the concern is what is the rationale underlying the department's regulations, and it is that very concern that female inmates might suffer worse rehabilitative outcomes if they're not allowed to possess that property. It's true that there was not a factual record developed in the district court on that specific point. If that's a concern to the court, then there certainly could be evidence introduced on that point, but this was the recommendation of experts in corrections, again, over the course of the decades of the California legislature in ordering the department to enhance its historical record of gender responsiveness, and there's no reason why the department should be prohibited from allowing female inmates to possess property items that can lead to better outcomes without unduly impacting the security situation in the prison. If the court has no further questions, we're prepared to submit at this point, but I'd be happy to address any additional questions the court may have. Thank you, Your Honor. All right. Mr. Dickerson, I think you have a few more minutes. Thank you, Your Honor. I think that what we just heard from the government actually really just underscores how thin this record truly is. He pointed to the ComStat data, and I think, as Judge Hunsecker mentioned, or maybe Judge Tolman mentioned, you know, it essentially is two pages. It has the highest level of—it essentially just has the number of violent offenses committed by men in various different categories. It doesn't even have per capita numbers. It just has the aggregate number, and, of course, you know, at that time there were about 5,000 women in California prisons and 125,000 men, so they couldn't even give us aggregate, you know, per capita statistics. They had to rely on aggregate statistics, and then there are these huge categories where there's just nothing whatsoever. You know, they rely on the idea that men are more likely to gamble. There's nothing in the record about gambling. They say that men are more predatory and more likely to steal, and that's why they can't have high-value items. There's nothing in this record about stealing. There's nothing in this record at all about the hygiene products, and I think we know from the administrative record that the hygiene products were based on stereotypical beliefs. And then, you know, we discussed, you know, this question of Pruno a good amount. You know, all we have in the record is essentially a statement by Captain Bickham. Opposing counsel said he would sort of know, but there's really no basis for the court to infer that Captain Bickham has any personal knowledge of that whatsoever. He didn't say it was based on personal knowledge. The sort of information is generally not within someone's personal knowledge because it is. Sorry. Counsel, doesn't Captain Bickham recount his career with the California Department of Corrections starting as a correctional officer working the tiers in prisons? Can he draw on his experience and his affidavit? Absolutely, Your Honor, he can. But the thing he's trying to attest to is that men, in general, are more likely to make Pruno than women are. And he's never said that he's worked in a female facility. We have no reason to think that he knows how much Pruno is or is not being made in a female facility. I should note in the administrative record, MJN 371, one of the commenters noted that, you know, specifically said, is there any reason to think that women don't make Pruno? And the government didn't respond to that in the administrative record. So this was an issue that has been lingering for a while. It's just an assumption, it seems, that the government has, very similar to the assumption in Craig v. Boren, that men are more likely to get drunk and they're unlikely to do bad things when they're drunk. But there isn't any record evidence here, and it doesn't seem like there was any record evidence, even before the department when they made this policy about Pruno. So I think all of that just shows that the government has not come anywhere close to meeting its burden under intermediate scrutiny, at least based on this record. The other point that was discussed a little bit, and I want to clarify this, is the differences between security classifications. And I think it's telling that the state mentions administrative segregation. But I want to be clear. So within the general population, every single prisoner is categorized as a one to four, based on their commitment offense, based on their conduct. And that comparison is made based on the same factors for men and women. Some people are put in administrative segregation, which, as we understand it, is sort of a temporary thing, usually for infractions, but it's not really based on the same thing as the basic security classification. And women who are in the highest security classification, the most dangerous women, are still entitled to dozens more items of property than men in the lowest security classification. And we didn't hear anything, I think, from the other side that disputed that. That's clear, the fact, in this case. At a minimum, there has to be some evidence to make that distinction. And there literally is a gaping absence of evidence on that question. I have a question for you, counsel. Sure. If the whole point, sort of boiling it down or simplifying intermediate scrutiny, is to make sure that decisions are made on reasoned grounds as opposed to stereotypes, we do have information in this record to indicate that the state of California was trying to be responsive to rehabilitative needs of women as opposed to just drawing arbitrary lines. So what do we do with that? I mean, this isn't a record that shows us, at least based on what we have, that there's some sort of nefarious purpose going on here. That's correct, Your Honor, and that's the case in a lot of the Supreme Court's cases. You know, there was allegedly a benign purpose in the Mississippi University women's university case, which was to increase women's access to the job market through going to nursing school. There was a benign purpose in Craig v. Boren, which was to make sure that women, very similar to this, the presumption was women are less dangerous than men, so they should be allowed access to this 3.2 percent beer. So there's often a benign motivation behind these laws, but that's precisely the problem. Sometimes even when there's a benign motivation, the law is still infected with stereotypical assumptions, and that's clearly what happened here. There was this master plan that we heard about, which says at one page, on page 57, that property schedules should be more gender responsive. We were happy to take that as what they were trying to do, but in translating that, they have to then engage in at least some reasoned analysis, some collection of data. They can't just rely on the assumptions they have in their mind, which is seemingly what happened here. They assumed that women are more likely to respond well based on appearance and so forth. They admitted that they didn't collect any data on any of these things, and that's just sort of a, I think it's a problem if what the government does is instead of going through the actual difficult, rigorous process of trying to be gender responsive, it just does something that says, let's just quickly give women a bunch more property, and then we don't have to think about it anymore. So I think that is what this record reflects. Okay, you're out of time.  Thank you, Your Honor. Thank you, counsel, for your arguments today. I also want to just in particular thank Mr. Degersen for his representation, as he's acting pro bono in his speech on an order, and we appreciate the representation you provided to your client. Thank you, Your Honor.
judges: Siler, Tallman, Hunsaker